1  **WO**

2

3

4

5

6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE DISTRICT OF ARIZONA

8

9  Cynthia L. Janos,                                    )        No. CV 05-1504-PHX-NVW
                                                        )
10            Plaintiff,                                )        **ORDER**
                                                        )
11  vs.                                                 )
                                                        )
12                                                      )
    Wells Fargo Bank, National Association,)
13                                                      )
              Defendant.                                )
14                                                      )
                                                        )
15  _____)

16

17       The court has considered the plaintiff's First Amended Complaint (doc. # 23)

18  ("Complaint"), the Motion To Dismiss Counts One And Two Of First Amended Complaint

19  (doc. # 29) ("Motion"), the Response (doc. # 35) ("Response"), and the Reply (doc. # 41)

20  ("Reply").

21       Plaintiff Cynthia Janos ("Janos") brought this action against Defendant Wells Fargo

22  Bank, N.A. ("Wells Fargo") alleging violations of statutory and regulatory disclosure

23  requirements applicable to Wells Fargo's Direct Deposit Advance program.  Wells Fargo's

24  Direct Deposit Advance program provides account holders who receive periodic direct

25  deposits the option of taking an advance, which is then debited along with a fee of 10% of

26  the amount of the advance from the account holder's next direct deposit.  Janos receives

27  Social Security benefits for permanent disability by direct deposit and utilized Direct Deposit

28  Advance.  In light of her reduced Social Security payment the following month, and without

1   other income to pay for her living expenses, Janos felt pressure to take another advance.  In

2   this way Janos soon became trapped in a cycle of taking additional advances every month,

3   while the associated fees left her further and further impoverished.

4       Janos alleges in Claim One of her Complaint violations of the Truth In Lending Act,

5   15 U.S.C. §§ 1601 *et. seq.*, and its implementing Regulation Z, 12 C.F.R. §§ 226, stemming

6   from Wells Fargo's failure to disclose annual percentage rates ("APR") for the interest on the

7   advances.  In Claim Two Janos alleges violations of 12 C.F.R. § 7.4008 and the Credit

8   Practices Rule, 12 C.F.R. § 227.13(c), insofar as the advances were based solely on the value

9   of collateral, involved assignment of unearned wages, and were "unfair and deceptive."

10  Claim Three is not addressed on this Motion but alleges state law violations related to Wells

11  Fargo's treatment of Janos on a particular occassion.  Wells Fargo now moves to dismiss

12  Claims One and Two for failure to state a claim upon which relief can be granted.[1]

13  **I.    Legal Standard For Motion To Dismiss**

14      The Court may not dismiss a complaint for failure to state a claim "unless it appears

15  beyond doubt that the plaintiff can prove no set of facts in support of his claims which would

16  entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994).  "Dismissal can

17  be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged

18  under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th

19  Cir. 1988).  When analyzing a complaint for failure to state a claim, all factual allegations

20  are taken as true and construed in the light most favorable to the nonmoving party. *See Iolab*

21  *Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994).   The Court must assume

22  that all general allegations "embrace whatever specific facts might be necessary to support

23  them." *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994). The Court

24  does not need to assume, however, that the plaintiff can prove facts different from those

25

26

27      [1] Janos previously moved to certify two classes of plaintiffs corresponding to Claims
    One and Two.  (doc. # 24.)  The court has stayed that motion pending resolution of the
28  motion to dismiss.  (doc. # 25.)

1  alleged in the complaint.  *See Associated Gen. Contractors of Cal. v. Cal. State Council of*
2  *Carpenters*, 459 U.S. 519, 526 (1983).

3  When the complaint is dismissed for failure to state a claim, "leave to amend should
4  be granted unless the court determines that the allegation of other facts consistent with the
5  challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Sery-*
6  *Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  Leave to amend is properly denied
7  "where the amendment would be futile." *DeSoto Yellow Freight Sys.*, 957 F.2d 655, 658 (9th
8  Cir. 1992).

9  **II.    Count I: Truth In Lending Act**

10  Janos alleges in her Complaint that Wells Fargo's Direct Deposit Advance program
11  is in violation of the Truth In Lending Act, 15 U.S.C. §§ 1601 *et. seq.*, and its implementing
12  Regulation Z, 12 C.F.R. §§ 226.  As an initial matter, the parties disagree about what type
13  of credit plan delineated in the statute is at issue.  Janos alleges that the Direct Deposit
14  Advance program is a "closed end" credit plan and therefore subject to the disclosure
15  requirements of 15 U.S.C. § 1638 and 12 C.F.R. §§ 226.17-226.24.  Wells Fargo disputes
16  Janos' characterization and argues that the plan is "open end," subject to the disclosure
17  requirements of 15 U.S.C. § 1637 and 12 C.F.R. §§ 226.5-226.16.

18  **A.    Direct Deposit Advance Is An Open-End Plan**

19  The Office of the Comptroller of the Currency ("OCC") has issued an interpretive
20  letter stating that a program virtually identical to Direct Deposit Advance was "open end."
21  OCC Unpublished Interpretive Letter (April 11, 2001) ("OCC Letter").  Janos has not
22  attempted to distinguish the Direct Deposit Advance program from the program examined
23  in the OCC Letter.  Rather, Janos argues that the OCC's interpretation is not authoritative
24  because the Federal Reserve Board rather than the OCC is in charge of writing the
25  regulations that implement the Truth In Lending Act.  (Response at 11:17-12:2.)

26  The OCC is a proper agency to issue authoritative interpretations about the Truth In
27  Lending Act's application to national banks.  As stated by the Supreme Court, "It is settled
28  that courts should give great weight to any reasonable construction of a regulatory statute

1   adopted by the agency charged with the enforcement of that statute."  *Nationsbank of N.C.,*

2   *N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995) (citations omitted).  The

3   OCC is charged with the enforcement of Regulation Z against national banks.  15 U.S.C. §

4   1607(a)(1)(A); 12 C.F.R. § 226 App. I.  The OCC's reasonable constructions of the Truth In

5   Lending Act and Regulation Z with respect to national banks therefore deserve deference.

6   *See Nationsbank*, 513 U.S. at 260-61, 256 (giving deference to OCC's interpretation of 12

7   U.S.C. § 92 because the Comptroller "bears primary responsibility for surveillance of the

8   business of banking") (internal quotations omitted).

9          **1.       Reasonableness Of The OCC's Interpretation**

10       The OCC Letter finding that such credit plans are "open end" is reasonable.  "The

11  term 'open end credit plan' means a plan under which the creditor reasonably contemplates

12  repeated transactions, which prescribes the terms of such transactions, and which provides

13  for a finance charge which may be computed from time to time on the outstanding unpaid

14  balance."  15 U.S.C. § 1602(i).  The credit plan analyzed in the OCC Letter reasonably

15  satisfies these criteria.

16       First, a bank reasonably contemplates repeated transactions under this form of credit

17  plan.  Whereas some creditors cannot reasonably expect repeated credit transactions because

18  of the context in which their business operates, *see* 12 C.F.R. § 226 Supp. 1, § 2(a)(20) cmt.

19  3 ("The criterion regarding repeated transactions is a question of fact to be decided in the

20  context of the creditor's type of business and the creditor's relationship with its customers."),

21  the same may not be said about a bank, for which providing credit is itself the business.  *See*

22  *id.* at cmt. 3(ii) ("It would be more reasonable for a financial institution to make advances

23  from a line of credit . . . than for an automobile dealer . . . .").  Janos herself, moreover, has

24  engaged in repeated Direct Deposit Advances and takes issue specifically with the cyclical

25  harm that tends to arise from repeated transactions under such programs.  (Complaint at ¶ 7.)

26  The OCC could reasonably determine that a bank with such a credit plan reasonably expects

27  repeated transactions.

28

Second, the interpretation of such a plan as an "open end" plan is consistent, at least, with the requirement that a finance charge "may be computed" from time to time based on the "outstanding unpaid balance."  The OCC Letter program's finance charges were computed based on the amount borrowed, at a rate of $1 for every $20 advanced.  OCC Letter at ¶ 2.  Where the advance is the first one taken by a customer that month, the amount of the advance equals the outstanding unpaid balance; the finance charge calculated on that first advance is therefore "computed" based on the "outstanding unpaid balance."

Third, the total amount of credit that may be extended under such a program is unlimited.  The "criterion of unlimited credit distinguishes open-end credit from a series of advances made pursuant to a close-end credit loan commitment." 12 C.F.R. § 226 Supp. 1, ¶ 2(a)(20) cmt. 5.  Credit is "unlimited" where available credit replenishes as earlier advances are repaid.  *Id.*  Under the program reviewed in the OCC Letter, the credit line was reusable and replenished as earlier advances were repaid, with the maximum amount available to the customer under the program acting as a line of credit.. OCC Letter at ¶ 5.  The total amount of extended credit under the plan was therefore unlimited.

## 2.     Applicability Of The OCC's Interpretation

Janos has not attempted to distinguish Wells Fargo's Direct Deposit Advance program from the program reviewed by the OCC in its interpretive letter.  Nothing in the Complaint suggests, for example, that Wells Fargo in particular has less reasonable expectations of repeated transactions than other creditors with such plans.  Wells Fargo's plan, like the OCC Letter plan, also bases its finance charge on the amount advanced, consistent with the requirement that finance charges be computed from time to time based on the outstanding unpaid balance.  (Complaint at ¶ 7.)  Finally, Direct Deposit Advance is not alleged to operate in any way  to limit the amount of credit available to its customers.

Janos suggests, however, that that Direct Deposit Advance is not actually a "plan." (Response at 11:3-7.)  The definition of an "open-end" credit plan "requires that there be a plan, which connotes a contractual arrangement between the creditor and the consumer." 12 C.F.R. § 226 Supp. 1, § 2(a)(20) cmt. 2.  Here, although Janos argues abstractly that

customers agreeing to such terms at an automated teller machine have not entered a contractual arrangement, she provides no authority for the proposition. Customers using Direct Deposit Advance agree to terms and conditions of the loan (*see* Complaint at ¶ 6) and are presumably bound thereby. Direct Deposit Advance therefore qualifies as a credit "plan" under the Truth In Lending Act.

Because the Direct Deposit Advance program is not materially different from the credit plan analyzed in the OCC Letter, the OCC Letter is authority here. The court gives the OCC Letter's reasonable interpretation significant if not complete deference. *See Nationsbank of N.C. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995) ("If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.'"); *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 563 (9th Cir. 2002) ("We give 'great weight' to any reasonable construction of a regulatory statute adopted by the agency charged with its enforcement"); *Cmty. Bank of Az. v. G.V.M. Trust*, 366 F.3d 982, 987 (9th Cir. 2004) ("As an agency charged with administering the Act, the OCC's interpretations of that statute are entitled to deference."). The Direct Deposit Advance program is therefore properly viewed as an "open end" credit plan for the purposes of this motion.

**B.     Annual Percentage Rate Disclosure Requirements Under Open End Plan**

Janos alleges in the Complaint that if Direct Deposit Advance is an "open end" plan, Wells Fargo is in violation of the open-end initial disclosure requirements of 15 U.S.C. § 1637(a)(4) and 12 C.F.R. § 226.5(b)(1), based on its failure to disclose the applicable APR for such transactions before the first transaction is entered. (Complaint at ¶ 18.) In relevant part, 15 U.S.C. § 1637 states:

> **(a) Required disclosures by creditor**
> Before opening any account under an open end consumer credit plan, the creditor shall disclose to the person to whom credit is to be extended each of the following items, *to the extent applicable*:
> . . .
> **(4)** *Where one or more periodic rates may be used to compute the finance charge*, each such rate, the range of balances to which it is applicable, and the corresponding

nominal annual percentage rate determined by multiplying the periodic rate by the number of periods in a year.

15 U.S.C. § 1637 (emphasis added).  The corresponding regulation requires the creditor to "furnish the initial disclosure statement required by § 226.6 before the first transaction is made under the plan."  12 C.F.R. § 226.5(b)(1).  Part 226.6 in turn requires the initial disclosure statement to include "disclosure of *each periodic rate that may be used to compute the finance charge,* the range of balances to which it is applicable, and the corresponding annual percentage rate."  12 C.F.R. § 226.6(a)(2) (footnote omitted; emphasis added).

Wells Fargo argues that these provisions do not require disclosure by Wells Fargo because Wells Fargo does not use a "periodic rate" to calculate finance charges.  "*Periodic rate* means a rate of finance charge that is or may be imposed by a creditor on a balance for a day, week, month, or other subdivision of a year."  12 C.F.R. § 226.2(a)(21).

According to the Official Staff Interpretations of 12 C.F.R. § 226.2, a periodic rate "does not include initial one-time transaction charges, even if the charge is computed as a percentage of the transaction amount."  12 C.F.R. § 226 Supp. I, § 2(a)(21).  Here, Wells Fargo's finance charge is 10% of the amount borrowed.  (Complaint at ¶ 6.)  Even assuming it is a "transaction charge," it is not an "initial one-time" transaction charge, given that Wells Fargo collects the percentage on every transaction entered and irrespective of whether the customer is a first-time user of Direct Deposit Advance.

The 10% finance charge itself, moreover, is not "periodic."  Regardless of how long the advance will be outstanding, Wells Fargo's finance charge is calculated at 10% of the advance.  (Complaint at ¶ 11.)  The percentage is thus a "flat" rate and not connected to any particular period of time like a "periodic" rate.  *See* 12 C.F.R. § 226 Supp.1, § 2(a)(21) (noting that periodic rates "may be stated as a percentage (for example, 1½% per month) or as a decimal equivalent (for example, .015 monthly)").

A periodic rate could, however, be separately calculated for each advance made under the program.  Wells Fargo knows at the outset the duration of each advance since it knows the date the advance will be repaid from the customer's next regular deposit.  Direct Deposit

Advance is only offered to customers with regularly arriving deposits.  For example, Social Security payments as in this case are made monthly, and states often require employers to select fixed paydays. *See, e.g.*, Ariz. Rev. Stat. § 23-351 (requiring employers to "designate two or more days in each month, not more than sixteen days apart, as fixed paydays for payment of wages to their employees.").  With a finance charge of 10% of the advance and a loan duration of one month, for example, the APR is 120%; where the loan duration is one day, the APR is 3,650%.  Knowing the expected duration and finance charge percentage to be imposed, an equivalent periodic rate for each advance can be inferred.

Nevertheless, any such equivalent periodic rate would not be "used to compute the finance charge" within the meaning of the statute and regulations.  Rather than being "used to compute" the finance charge, a periodic rate or equivalent obtained in this way would be deduced *from* the finance charge and the expected loan duration.  Inferring an equivalent periodic rate from a fixed finance cost is a different process from using an established periodic rate to calculate interest.  The statute and regulations require initial disclosure of an applicable APR for the latter but not the former.

### C.     Conclusion

The initial disclosure requirements of 15 U.S.C. § 1637(a)(4) and 12 C.F.R. § 226.6(a)(2) do not apply where the creditor uses a flat percentage to determine the finance charge irrespective of the duration of the loan.  Wells Fargo is therefore not required by these provisions to disclose periodic rates and annual percentage rates.  The closed-end violations alleged are inapplicable because Direct Deposit Advance is an open-end plan.  The motion to dismiss Claim One for failure to state a claim is therefore granted.

### III.    Count II: Other Banking Regulations

Claim Two of the Complaint alleges two kinds of violation of 12 C.F.R. § 7.4008: (1) that Wells Fargo made consumer loans based solely upon the value of collateral and (2) that Wells Fargo engaged in "unfair or deceptive" practices in connection with a consumer loan program.  (Complaint at ¶¶ 26-29.)  Claim Two further alleges violation of the Credit Practices Rule, 12 C.F.R. § 227.13(c), because Wells Fargo entered a consumer credit

transaction irrevocable by the consumer containing an assignment of wages not yet earned. (*Id.* at ¶¶ 31-32.) Janos has withdrawn, however, the Credit Practices Rule claim and the first of the § 7.4008 allegations, leaving only the "unfair or deceptive" practices claim to be addressed on this motion.  (Response at 16:5-15.)

The portion of 12 C.F.R. § 7.4008 relevant to Janos' "unfair or deceptive" practices claim states:

> (c) *Unfair and deceptive practices*.  A national bank shall not engage in unfair or deceptive practices within the meaning of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and regulations promulgated thereunder in connection with loans made under this § 7.4008.

12 C.F.R. § 7.4008(c).  Wells Fargo has moved for dismissal because no express private right of action corresponds to this section.  Janos in turn asks the court to consider the regulatory purposes behind this part and to infer a right of action allowing for its private enforcement. (Response at 16:1-3.)  Though it does not matter for this motion, at oral argument Plaintiff could not articulate how Wells Fargo's Direct Deposit Advance program is unfair or deceptive under the incorporated Federal Trade Commission Act standards.

## A.    Right Of Action

The Supreme Court has, as a general matter, abandoned the practice of implying new rights of action into federal statutes.  "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).  The Court in *Sandoval* went so far as to liken the practice to an unfavorable addiction:  "Having sworn off the habit . . . we will not accept respondents' invitation to have one last drink."  *Id.* at 287.  Soon after these statements in *Sandoval*, the Court reiterated its position in *Correctional Services Corporation v. Malesko*, 534 U.S. 61 (2001):

> Since our decision in *Borak*, we have retreated from our previous willingness to imply a cause of action where Congress has not provided one.  Just last Term it was noted that we "abandoned" the view of *Borak* decades ago, and have repeatedly declined to "revert" to the understanding of private causes of action that held sway 40 years ago.

1    *Id.* at 67 n.3 (internal citations and quotations omitted) (citing *Alexander v. Sandoval*, 532

2    U.S. 275, 287 (2001)).  Supreme Court precedent in the current era thus strongly disfavors

3    the creation of a rights of action where no such right is found in the statutory text.

4        At the same time, the Supreme Court's earlier-era cases evincing more willingness to

5    imply a right of action into a statute remain as precedent.  The Ninth Circuit continues to

6    apply the framework of these earlier cases — as that framework was laid out in *Cort v. Ash*,

7    422 U.S. 66 (1975) — and otherwise to acknowledge its continued viability.  *See, e.g.*,

8    *Greene v. Sprint Communications Co.*, 340 F.3d 1047, 1052-53 (9th Cir. 2003) (performing

9    *Cort v. Ash* analysis); *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1096 n.7

10   (9th Cir. 2005) ("Although *Cort* remains viable following *Sandoval* . . . ."); *Walls v. Wells*

11   *Fargo Bank, N.A.*, 276 F.3d 502, 508 (9th Cir. 2002) ("While neither the Supreme Court nor

12   our court has abandoned consideration of all the Cort factors . . . .").

13        The uncertainty need not detain the court in this case, however, because Janos seeks

14   to imply a right of action from and into a regulation.  The Supreme Court has held that only

15   rights-creating language in statutes, not regulations, may underlay implication of a right of

16   action.  *Sandoval*, 532 U.S. at 291 (holding that rights-creating language in regulations

17   without such language in the statute will not support implication of a right of action).  Here,

18   Janos seeks to imply a right of action solely from the policy rationale behind enactment of

19   12 C.F.R. § 7.4008(c).  (Response at 14:8-19.)  The only statutory provision Janos relies

20   upon is 12 U.S.C. § 93a, which is the OCC's general grant of rulemaking authority to carry

21   out the responsibilities of its office.  Janos thus overlooks Supreme Court doctrine that

22   "regulations *alone* cannot create rights enforceable through either an implied right of action

23   or *Section 1983*."  *Price v. City of Stockton*, 390 F.3d 1105, 1112 n.6 (9th Cir. 2004)

24   (emphasis in original); *see also Save Our Valley v. Sound Transit*, 335 F.3d 932, 937 (9th

25   Cir. 2003) ("[O]nly *Congress by statute* can create a private right of action." (emphasis in

26   original)); *Greene*, 340 F.3d at 1050 ("It is axiomatic that private rights of action must be

27   created by *Congress*." (emphasis added)).

28

1   The court also notes that even the regulation relied upon by Janos does not contain

2   rights-creating language. "Statutes that focus on the person regulated rather than the

3   individuals protected create no implication of intent to confer rights on a particular class of

4   persons." *Sandoval*, 532 U.S. at 289; *see also Cannon v. Univ. of Chicago*, 441 U.S. 677,

5   690 (1979) (distinguishing rights-creating statutory language of "no person shall be denied

6   the right to vote . . . ." from language generally found in criminal statutes for the protection

7   of the general public). The regulation relied upon by Janos prohibits certain conduct by

8   national banks and makes no mention of who the beneficiary of that prohibition will be.

9   **B.     Effect Of Absence Of Right Of Action**

10   That portion of Claim Two not withdrawn by Janos on this Motion is not properly

11   before the court because Janos lacks a private right of action to enforce 12 C.F.R. §

12   7.4008(c). The court therefore grants the motion to dismiss Claim Two for failure to state

13   a claim upon which relief can be granted.

14   **IV.   Leave To Amend**

15   "[L]eave to amend should be granted unless the court determines that the allegation

16   of other facts consistent with the challenged pleading could not possibly cure the deficiency."

17   *Schreiber Distrib. Co. v. Sery-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). For

18   Claim One, the court does not perceive additional allegations that could save the Complaint.

19   At oral argument counsel for Janos acknowledged that he also could not think of any further

20   allegations. Leave to amend is therefore denied as to Claim One.

21   Similarly, no further allegations could save Claim Two, for which there is no private

22   right of action. Leave to amend is therefore denied for Claim Two.

23   **V.    Rule 54(b) Certification**

24   There is no just reason for delay in entry of judgment against Janos on Claims One

25   and Two. Janos' remaining state law claim for false imprisonment is based on entirely

26   different facts than Claims One and Two and would be severed for trial in any event. An

27   immediate appeal of this order would not threaten duplication of judicial work through

28   repetitive appeals on related issues or transactions. Moreover, Janos seeks class certification

1   on these two Claims.  Any error in this ruling could delay vindication of absentees' rights

2   unless this order is made final.  For these reasons the court directs entry of final judgment as

3   to Claims One and Two under Rule 54(b), Fed. R. Civ. P.

4   **IT IS THEREFORE ORDERED** that Wells Fargo's Motion To Dismiss Counts One

5   And Two Of First Amended Complaint (doc. # 29) is granted.

6   **IT IS FURTHER ORDERED** that Counts One And Two Of First Amended

7   Complaint are dismissed with prejudice for failure to state a claim upon which relief can be

8   granted.

9   **IT IS FURTHER ORDERED** that Janos' Motion For Certification Of Class (doc.

10  # 24) is denied as moot.

11  **IT IS FURTHER ORDERED** that the Court expressly determines that there is no

12  just reason for delay in the entry of final judgment against Plaintiff on Claims One and Two.

13  The Court expressly directs the Clerk to enter judgment against Plaintiff on Claims One and

14  Two.

15  DATED this 14th day of February 2006.

16

17

18  _____

19  Neil V. Wake
    United States District Judge

20

21

22

23

24

25

26

27

28

- 12 -